Teresa Porby, Parking Systems Plus, Inc. Teresa Porby, Parking Systems Plus, Inc. Good morning, Your Honors. May it please the Court, Chad Wallace for Teresa Porby and the National Labor Relations Board. Refusal to hire a predecessor's employees because they have a union is the functional and equivalent to a mass discharge, which is one of the worst labor law violations an employer can make because it's so inherently destructive of employee rights. Here we have an administrative law judge's well-reasoned, well-supported decision finding parking systems. So the district court didn't have the benefit of the ALJ's decision? It did not. It had the entire record before it, but the ALJ's decision came out. The district court's record, was it the same as the record before the ALJ? It was. And we're able to consider the ALJ's decision because judicial notice is part of the proceeding? Yes. I believe we also issued a 28-J letter to the court when the ALJD came out. And this and other courts have taken when an ALJD, excuse me, administrative law judge's decision comes out after the district court is an excellent indicator for the district court. And we're able to consider the ALJD's decision because judicial notice is part of the proceeding? Yes. I believe we also issued a 28-J letter to the court when the ALJD came out. And this and other courts have taken when an ALJD, executive notice is an excellent indicator for the district court. And we're able to consider the ALJD's decision because judicial notice is part of the proceeding? Yes. I believe we also issued a 28-J letter to the court when the ALJD came out. Yes. And I believe we also issued a 28-J letter to the court when the ALJD came out. And we're able to consider the ALJD's decision because judicial notice is part of the proceeding? Yes. I believe we also issued a 28-J letter to the court when the ALJD came out. And it has been done, but it's a fairly unusual procedure, isn't it? I would respectfully disagree, Judge Calabresi, that in terms of what the district court did was it violated Federal Rule of Civil Procedure 52A, which says it needs to actually explain how it got to its decision. There's – it's well settled in this circuit that if there is sufficient evidence in the record before this court, rather than remanding the case back to the court to explain its findings, this court can look at the record and make a decision based on that record, which is a significant record adding to the administrative law judges' decision. But presumably we do that because there are reasons for moving quickly. Correct. So what are the reasons for moving quickly? The district court insofar as said anything – it didn't say much – suggested that there was already so much delay that it didn't matter. But your position is, come on now, any further delay is really dangerous, and so you must act now. Could you spell that out? Certainly. And you used the exact words, any further delay. This court's decision in Hoffman v. Incredible Caterers said exactly that. They said that the appropriate test for 10J in a successorship case is whether the employee's collective bargaining rights may be undermined by the successor employer's unfair labor practices and whether any further delay may appear or undermine such bargaining in the future. That's where we're at right now. The parties still can be returned to the status quo, which is the standard for – which is what both 10J injunctions and the final board order seek to do, is to get the parties back to where they were before the unfair labor practices. However, even though the employees in this unit still wish to return, that sentiment won't last forever. There will be a critical point at which point they will not be able to be returned to the status quo. So that is why it's critical for this court to enter the injunction. Do we have any evidence of that? Or is it just a generic statement about how employees are – Well, there's the evidence in the record. There's the PORSEC affidavit that PORSEC is the – excuse me – is the union representative, the business agent. In that affidavit, there was a text chat with about 22 employees saying how they were disillusioned with the union, that they couldn't wait for the union to try to get their jobs back, that they had lost faith in the union because it couldn't protect them from parking systems. Interestingly, it also said – they said, we still support the union, we just don't trust it. More recently, this is not in the record, so court's indulgence. I'm sorry. If it's not in the record, well, maybe it is. It's a – if I may offer it for what it's worth. It's an email that we received in the – excuse me, NLRB received in about February 2025, shortly after the Administrative Law Judge's decision. The union had shared the Administrative Law Judge's decision with the employees saying, look, we won, at least at this stage, which then again renewed employees' interest in coming back. But similarly – If the former employees are reinstated, what happens to the current employees? The current employees, under board law, the current employees would be displaced because in this circuit's law, the rights of discriminated against employees are higher than those of the current employees. Presumably, not all of the former employees would come back because they settled in other positions. That's possible, yes, that they may – that not everyone may accept an instatement order. They are – they have the right to have that instatement order put in front of them. But no, not everyone necessarily needs to take it. In terms of the – Just to clarify, some of the former employees are actually there. There are a few of them. That's correct. But that is not dispositive here because they were hired after the unfair labor practices. And at a time when they saw what parking systems had done and failed to hire the other employees, failed to recognize the union. And so at that point – Does the record indicate whether the former employees who are now there now are making less money? The record does not have that information. Mr. Morrow may be able to speak to that. Okay. In terms of – one other thing I want to note in terms of the irreparable harm evidence is this circuit and others do recognize that certain unfair labor practices, there is an inherent amount of harm that comes with those. So, again, that's incredible caterers saying that it can damage employee confidence, that a new majority of employees would probably actually oppose a union where the successor refused to bargain. Fall River Dying, which is a major successorship case, there's a lot of talk about the inherent destructiveness during successorship. And then also I would point the court to Francisco Foods, Blader v. Francisco Foods, which is a Seventh Circuit case. Notably, it has been a four-part circuit since before Starbucks, which also noted that the union was in a particularly vulnerable situation during successorship. Are there any more questions? Thank you, Your Honors. May it please the Court. My name is Michael Morrow. I represent the Respondent Parking Systems Plus. Your Honors, the NLRB is ignoring the clear case mandate from the Supreme Court in McKinney v.    Starbucks. The four-factor traditional equitable test applies to? Yes, okay. We are not going to do what we did before with respect to injunctions. We have a new test which requires more things. It's all very well. Right. And we know that, but that doesn't settle this case at all. It doesn't settle the fact that the district court did not do what it should have done. And so then the question is, under this new four-factor test, are we enabled to issue an injunction, or should it send it back to a district court to apply the Supreme Court decision? Sure. The answer is the following, that this injunction has no basis, and there's no legitimacy to it and no merit. So this court shouldn't be issuing this decision to issue an injunction here based on this record, nor should it send it back to the district court either to render a new decision. I believe that the district court clearly didn't comply with the rule. There are no findings of fact, no conclusions of law. Well, to the extent that I would defend that decision, again, I go back to the element. Do you think that the four-sentence minute order complies with the mandates of Rule 52? I think it does to the following extent, that the irreparable harm component is the most important under Rule 65. That's very clear in this circuit. Delay, heavy delay like we have here, weighs directly against the irreparable harm component. If that cannot be shown, the analysis ends at that point. That's clear precedent in this case, in this circuit. There's nothing that changes the timeline. The extraordinary delay, which was completely ignored by the NLRB in their briefs, and at the district court level and at this level, their delay in this court to not move for an expedited appeal, they waited 30 days to file their notice of appeal. It's still required, isn't it, to consider the other factors as well. And if, let's say, there was, in your view, a weak showing of irreparable harm based on timing, but there was an extremely strong showing, let's say, if the district court concluded on the likelihood of success on the merits, that's why the factors should all be considered. And it is very clear here that the district court only ruled on the one. Thank you, Your Honor. In fact, this Court has said in Grand River Entertainment v. Prior, if you cannot show irreparable harm, there is no going past and having consideration of any further element. So on the irreparable harm component, again, delay is a piece of the pie here, so to speak, as to why there was a totally deficient showing. Again, why isn't there irreparable harm even if there was delay? These people are still out. They would want to come back. They may not have wanted to act as quickly, or people should have acted fast. But to these people, they're out of work. Why isn't there irreparable harm? So there's a couple of reasons why. Number one, the Supreme Court was clear. They do not take into contextual purposes of the NLRB's mandate. That's number one. So they don't get an extra leniency in terms of the irreparable harm standard. That's clear. In fact, the Supreme Court specifically said, you do not take into account that the NLRB is the guardian of national labor policy. That's number one. The case, incredible caterers. The question was about the employees. Aren't the employees suffering irreparable harm, the former employees? Sure you are. Thank you. And they are not, and here's why. The record that was prepared by the NLRB at the district court level was extraordinarily deficient. All they came forward with is one affidavit from eight months prior to their application. They didn't bring in affidavits from not one other alleged affected person, not one, and they clearly could have done that in all that time. They have a text chain they're coming to you with, a text chain, oh, they would like their jobs back, and that text chain is like two years old. When you come into court for injunctive relief, it's I am dying. I need relief right now. And what they gave you was one affidavit from the business agent of the union, not a single affidavit from the union. Isn't it perfectly obvious that people are going to want their jobs back? I mean, come on now. Maybe they should have brought in 27,000, you know, however employees swearing on it, but jeepers. Can't one just go and play common sense on that? Well, yes, and the common sense is the following. Eleven people from this unit were reemployed at that location. There's been no evidence whatsoever provided by the petitioner here that any further person came and was applied for that position. So it begs the question, as you say, common sense. Well, wait a second. They actually put back 11 of these 30 people. Clearly they were hiring them. Where are they? Why didn't they apply? Where is the evidence of the record that they did want to apply? Where is any evidence of this e-mail that came in saying, hey, we won the case, you know, come on back? So the common sense is, sure, parking systems rehired 11 of them. Where are the rest? Clearly parking systems has been hiring. To what extent does the ALJ's subsequent decision change things? Does that not suggest a likelihood of success on the merits? It doesn't to the extent of the following, is that we've certainly appealed that decision. Exceptions were filed to the NLRB in Washington. It's been fully briefed. We believe that the decision, of course, is catastrophically flawed. Of course, we've got the problem that the NLRB can't act. So we're in a situation where there is now a situation where we either do something on that or not, or the delay becomes indefinite. Sure. But we go back to the whole purpose of Rule 65 and the equitable principles behind it. The NLRB needed to move quickly. They didn't. Had they moved much closer in time, this all could have been avoided. But now the NLRB didn't move in time. Now they're going to try to claim the benefit of, well, there's a shutdown, people haven't been confirmed. They needed to move quickly. I've litigated these cases before in this district. They generally move quickly. If you want to talk about what's not in the record but to take judicial notice, the general counsel of the NLRB on September 5th, 2025, issued a memorandum saying, notice to all the regents, when you have potential 10J, you must move immediately for consideration in filing it. That is nothing new here. But they didn't here. There is no explanation on any point. That's what's so important about when you raise this issue of, well, there's no NLRB functioning right now. So they get the benefit of not moving quickly when they could have at not just the initial investigative level, which, and by the way, in our papers we repeatedly discuss the timeline where the NLRB counsel says, on three different occasions, in April, May, and September, hey, I'm going to move for, we're submitting this to the 10J junction branch, so please go on ahead. Do you want to settle? So they've known all along, and if they were so concerned, it was such common sense, we've got to get these people back, why didn't they move? And that's your irreparable harm why it doesn't exist in this case. But I must, in the remaining time, get to this point about the burden on what would actually in order, if it were to be granted, what does that actually mean here? It would be catastrophic because this isn't just returning warehouse workers to an Amazon facility or retailers to a coffee shop. Parking system services, Stony Brook University Hospital, we have a cancer patient where we have critical care, we have emergency rooms. If there was an order to say, tomorrow, all parking systems current operation people get out and bring in these other people who have not been part of parking systems for two years, they don't know, these people coming back in, they're not going to know how a parking system operates. The board even recognizes that there's a completely different way that parking systems operate. How in the world would parking systems be able to train these people overnight, this is how we do it here, and not disrupt the service at Stony Brook. We have a quote-unquote innocent third party here that's going to be dramatically impacted by this type of throw everybody out, bring in this team off the bench, go back to how it was. You have 10 out of 30 who are already there and before and who presumably worked with the others, don't you? Yes, but those 11 have been trained on parking systems policy. So now what practically I think maybe what you're suggesting is those 11 can just kind of, well, here, this is how we used to do it two years ago at this other entity, and let's go back to that. Oh, and here's the terms and conditions that work like. If you fired the people for a wrong reason under a labor law, you were creating yourself the situation of having people not being able to be trained, weren't you? Because you didn't keep them and train them as you did these 10. So now you're claiming, oh gee, because we did that, it's going to be a problem. It doesn't move me. Well, if I may answer in the remaining time that I have, two things I would say to that. One, that's precisely why the board should have moved when they thought that this union effort, a union desire was dissipating and this would be a problem. They didn't do that. The second, it doesn't get away from the burden to an innocent third party and to say, sorry, too bad, that parking systems should have anticipated the impact to, you know, patients at this hospital and what that would mean. They're an innocent party. They are going to get hammered, hammered if this court or a district court would turn around and say, you know what, sorry, national labor policy says we have to get you back in. And again, I would say that would create a terrible precedent if the sole deciding factor is, well, it's national labor policy, they committed a violation, we've got to get them back in. That wipes out any consideration of the four factors at all and would really open the floodgate to injunctions all of the time being granted. Thank you. All right. Thank you. So how do you respond to the argument about the delay? The delay. So that's, thank you, Judge, that's exactly what I was going to start with. A 10-J is not the same as your standard injunction, which because of the statutory nature, even though it still uses the four factors, but the board needs time to investigate and deliberate a case because, remember, there's no private right of action. If you feel that there has been a violation of National Labor Relations Act, you have to come to us. There's nowhere else you can go. So the board needs time to investigate. And then when the investigation is done, that needs to be presented to the regional director for determination of merits. And then when they determine that, they have to issue a complaint. And only at that point, because the statute specifically says upon issuance of a complaint, may petition a district court. Just to jump in, this process you're describing, though, it can be done more quickly than the, I don't know exactly how many months we're talking about here, but you're not suggesting this is how long as a norm that it takes? That's actually the typical life cycle of a case has to go through all these points. Right, but how long do those points typically take? We're talking, so this one, the union filed its charge early December of 2023. About four and a half months later, after the full investigation, the director concluded the investigation. Let's see, and then there was a complaint issued. The ALJ hearing happened in the summer. The petition was filed December 2nd, and then the decision was on the 14th. So it took about a year, is that? That's what we're coming up on. Okay, and so I guess that's, can these be done more quickly, or are they typically done more quickly? Or if we went and looked at a bunch of these, a year is what it's supposed to take, I guess is what I'm asking. And I see my time is about to run out, so if I could answer this in two parts. So the first one I want, as a comparator, specifically in this court, the Hoffman v. Incredible Caterers case is a 10-J case, which was also a successorship case, was within the same timeline. From charge filed to when this court ordered, it was similar. The 10-J petition was denied at the district court. We appealed. The time from the filing of the charge in May of 1999 to when this court ordered the injunction was two years. We are still well within. Right, but I guess that doesn't go to the delay, the responsibility of the NLRB. Certainly. The decision could have been pending for a year. Right. I'm trying to narrow it to between when the charge, between the charge and when you filed the action. Certainly. Well, one of the issues is we have historically been underfunded and understaffed, so we move as quickly as we can with the staff that we have. So a charge comes in. It needs to be investigated. But typically from the filing of a UOP charge to a merit determination is usually several months at that point. But I also want to point that this circuit specifically rejects the notion that the passage of time is sufficient to justify rejecting 10-J relief if there is ongoing employee interest and the employees will return if 10-J was granted. That's policy. That's the question I'm focusing on. I mean, all right, we are now in a situation where there was much delay. Is there a reason now in terms of the employees because of which it is irreparable harm not to act and do a 10-J? The other side says, but at this stage it causes a great deal of other harm. It's a different question. But is there a reason now, whatever the reason for the delay to 10 before? Yes. Delay on its own is not dispositive. The question is can the parties be returned to the status quo? The status quo here is the former classic employees are employed by parking systems, their union is recognized, and parking systems bargains with them in good faith. Based on the information we have, we have both the information that is in the record from the affidavit that says, and I might also note that the reason we typically do an affidavit from the union business agent is because they have the 20,000-feet view of the whole employee sentiment. But we have that evidence. Take that evidence that says the employees are willing to go back, the union stands ready to represent them. Add that to this circuit and others' jurisprudence that says there are certain harms that can be inferred that are likely irreparable harm. Take that all together, we can get the parties back to the status quo, which is what 10-J essentially does. So I would ask this court to vacate the lower court's order and issue an order for injunction. Thank you. All right. Thank you. Thank you both. I will take the case under advisement.